IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jessica Freeman, | ) | C/A No.: 1:09-679-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a report
and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff
("Plaintiff" or "Claimant") brought this action pursuant to 42 U.S.C. § 405(g) to obtain
judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for disability insurance benefits ("DIB"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether he applied the proper legal standards.

I.      Relevant Background

        A.      Procedural History

        Plaintiff filed an application for disability insurance benefits on November 17,
2003, alleging disability since December 6, 2001. Tr. 51–54. Her application was denied
initially and upon reconsideration. Tr. 33–38, 41–43. Administrative Law Judge ("ALJ")
Albert Reed conducted a hearing on August 30, 2005, at which Plaintiff, her then-attorney
Jamie Bell, Esq., and vocational expert ("VE") Joel Leonard appeared. *See* Tr. 307–49.

In his October 29, 2008 decision, the ALJ found Plaintiff was not disabled and retained the capacity to perform her past relevant work ("PRW"). Tr. 17–25. The Appeals Council denied Plaintiff's request for review, (Tr. 8-12), and Plaintiff appealed to this Court. On February 26, 2008, this court remanded the case for further evaluation of Plaintiff's alleged mental impairments. Tr. 390–408. Upon remand, the ALJ consolidated Plaintiff's November 2003 application with an application she filed in September 2006. *See* Tr. 57. On September 4, 2008, the ALJ conducted a supplemental hearing at which Plaintiff appeared with her attorney Paul McChesney, Esq. *See* Tr. 718–749 (Sept. 4, 2008 hr'g transcript). In an October 29, 2008 decision, the ALJ found that Plaintiff had not been disabled at any time between her alleged onset-of-disability date and June 30, 2006, the date her insured status for purposes of entitlement to disability insurance benefits expired. The ALJ found Plaintiff retained the ability to perform her past unskilled work as a mail sorter. Tr. 357–73. The Appeals Council denied review of the ALJ's February 2008 decision (Tr. 350–54), making it the Commissioner's final decision for purposes of judicial review. 42 U.S.C. § 405(g), 20 C.F.R. § 404.981 (2009). This appeal followed.

B.     Plaintiff's Background and Medical History

Plaintiff was 24 as of her December 6, 2001, the date she alleged onset of disability because of a motor vehicle accident. Tr. 51, 61. She has a high school education with some college, and PRW as a cashier, waitress, and mail sorter. Tr. 63–70, 311–18. Plaintiff alleged disability due to schizophrenia, depression, degenerative disc disease, and sinus problems. *See* Tr. 61.

1.    Medical Evidence

Plaintiff suffered contusions, lacerations, and a cervical strain in a December 6, 2001 car accident. Although the ALJ mentioned Plaintiff's apparent intention to amend her alleged onset date to December 6, 2000, she did not do so.  December 6, 2001 remains the onset date considered by the ALJ and herein. *See* Tr. 92–94, Tr. 357.  After the December 6, 2001 accident, Plaintiff complained of back pain, sinus problems, and headaches, as well as hallucinations and depression.[1]

In October 2003, Plaintiff reported to her primary care physician, Tresha Ward, M.D., that she was "having visual hallucinations." Tr. 152. Dr. Ward noted that Plaintiff's depression was "better but still persist[ed.]" *Id.*[2] Dr. Ward diagnosed depression with psychotic features and "[b]ipolar [d]isorder or [s]chizophrenia." Tr. 152. Her notes further indicate that she would make a psychiatric referral for Plaintiff if she had not improved in three-to-four weeks. *Id.* In January 2004, Dr. Ward noted that Plaintiff's visual hallucinations had decreased when on medications. She still had some hallucinations that "frighten[ed] her less."  Tr. 150.

---

[1] Plaintiff has not disputed the Commissioner's recitation of her medical history. Therefore, the undisputed medical evidence as stated by the Commissioner is set forth herein. Plaintiff has not appealed any issues related to her physical health, therefore, references to such are provided when necessary for context.

[2] Although Dr. Ward's October 2003 record, (Tr. 152), implies she had previous knowledge of Plaintiff's depression, neither the ALJ nor the parties points to any earlier records of Plaintiff's care for depression or other mental health issues, nor has the court's independent review revealed any such record.

In February 2004, Plaintiff saw psychologist Robert Noelker, Ph.D., for a consultative evaluation. She told him she had never sought mental health treatment. His report indicates that Plaintiff self-reported having problems that included depression, memory difficulties, and both auditory and visual hallucinations. His report indicates she had had the hallucinations "for a while," but that they got worse after her automobile accident. She told him she lived with her husband and two children, and that she did the "primary parenting" for her children. She said she cooked and cleaned, but that her husband did some of the cleaning because of her lower pain. She said she drove, but did not drive in heavy traffic because of anxiety. Dr. Noelker noted Plaintiff was fully oriented but appeared distracted by internal conversations. She had a flat affect and mood, coherent speech, poor insight into the nature of her condition, minimal judgment, and memory deficits. Plaintiff scored in the "upper range of the borderline" during IQ testing, but Dr. Noelker noted it was "more likely that [she] ha[d] at least average intellectual skills." He diagnosed a psychotic disorder and possible cognitive disorder, and recommended she see a psychiatrist. Tr. 137–43.

Also in February 2004, Dr. Ward responded to an inquiry from the Social Security Administration and indicated that she had not referred Plaintiff for psychiatric follow-up because "[s]he improved on Effexor. Her depression had resolved. She still had occ[asional] visual hallucinations. But they were much reduced [and] were not disturbing to her." Tr. 144.

Dr. Ward referred Plaintiff to neurologist Michael Hodge, M.D., who saw her in March 2004 for a consultative evaluation. Plaintiff reported to him that she had been experiencing visual and auditory hallucinations almost daily since her December 2001 accident. Tr. 145. He found she had a normal neurological status. Tr. 145. Her electroencephalographic study (EEG) was normal. Tr. 583. On examination, he found Plaintiff to be alert and coherent, with intact language and memory function. Dr. Hodge concluded that Plaintiff's hallucinations were likely psychological in origin. Tr. 145–46.

Also in March 2004, state agency psychologist Manhal Wieland, Ph.D., reviewed the evidence and found that Plaintiff's mental impairments caused some "moderate" limitations, that she had some memory and concentration deficits, and that she would do better with repetitive-type tasks and without significant public contact. He concluded that she should be able to handle simple tasks for two hours at a time, attend work regularly, relate to supervisors and co-workers, make simple decisions, adhere to basic standards for hygiene and behavior, protect herself from safety hazards, and use public transportation. Tr. 172–88.

In March 2004, Plaintiff told Dr. Ward her visual hallucinations were not disturbing to her because she knew they were not real. She told Dr. Ward she did not want to take anti-psychotic medication. Tr. 149.

On May 16, 2004, Plaintiff was evaluated at CareSouth Carolina Behavioral Health, which recommended she have psychotherapy and take medication. Part of her treatment plan was to work to rule out bipolar disorder and schizophrenia. Tr. 161.

At a therapy appointment in July 2004, Plaintiff reported grief due to her grandmother's illness, marital stress, anxiety, and mood problems. Tr. 586.

In August 2004, state agency psychological consultant Samuel Goots, Ph.D., reviewed the evidence and agreed with Dr. Weiland's March 2004 findings. *See* Tr. 174–75.

In September 2004, Plaintiff saw Dr. Ward and reported her grandmother's recent death, requesting an increase in her medication dosage. Tr. 204.

On October 4, 2004, Plaintiff reported to Dr. Ward that she still had hallucinations, but that the person in the hallucinations did not speak and seemed to be friendly. Tr. 203.

The following day, October 5, 2004, Dr. Ward wrote a short letter, indicating that Plaintiff was "totally and permanently disabled and unable to perform any gainful employment due to Schizophrenia. [Plaintiff] has daily visual hallucinations as well as paranoia." Tr. 196. She continued, opining that Plaintiff had "many disabling depressive symptoms such as poor concentration, memory loss, poor energy level, anhedonia, poor hygiene and lack of motivation." *Id.* She opined that "[a]ny sort of stress exacerbates the frequency and frightening character of her visual hallucinations." *Id.* She also indicated that Plaintiff's "degenerative disk disease []makes any job that requires lifting or prolonged standing or sitting unsuitable for her." *Id*. She concluded as follows: "Although I am hoping for a reduction in her Psychotic symptoms with trials of different medications and counseling, I do not feel that she is likely to improve to the point where she will be able to hold a job." *Id.*

Between October 2004 and January 2005, Dr. Ward treated Plaintiff for various complaints, including depression, scratchy throat, and ear pain. Tr. 197–201. Those treatment notes contain no substantive discussion of her depression symptoms or status.

During February and March 2005, Plaintiff received treatment at Kershaw County Mental Health. Tr. 206–13, 603–07. She indicated that she wanted a psychological evaluation to find out "what [was] wrong with her" and that she "sees things that are going to happen and then they happen." Tr. 213. She wanted counseling and medications to "make noises and voices go away." *Id.* Those treatment notes indicated that she had continuing symptoms (Tr. 206–13), but "functioned fairly well in daily life." Tr. 212.

In April 2005, Dr. Ward referred Plaintiff to McLeod Behavioral Sciences because of complaints of increased psychological symptoms. Tr. 214–53, 277–80, 588–91. Plaintiff told licensed professional counselor ("LPC") R. Fletcher that she heard voices and saw tragedies coming. Tr. 588. Plaintiff's husband spoke with Ms. Fletcher and indicated Plaintiff had been declining, had trouble finishing projects, and was easily distracted. He thought her last medication change had boosted her mood and energy, but that it left her more scattered. *Id.* Plaintiff remained hospitalized at McLeod Behavioral Services from April 12–17, 2005. *See* Tr. 214. Janet Woolery, M.D., explained that one of Plaintiff's medications was causing cardiac symptoms and was "also making her hypomanic." *Id.* Dr. Woolery further noted:

> By date of discharge, [Plaintiff] reported feeling much better; her anxiety was significantly better, she was thinking clearly, able to concentrate, complete tasks and she was no longer having any auditory or visual

hallucinations. She was feeling significantly better, felt like she had her emotions under control and she was tolerating that new medication, was sleeping well and functioning extremely well on the unit, going to all groups, bright and appropriate. On date of discharge she was alert, cooperative, speech was fluent, thought processes logical and goal-directed, nonpsychotic thinking was evidenced. She was never suicidal or homicidal. She was able to voice an appropriate discharge plan and to discuss her medications appropriately.

*Id.* Her Global Assessment of Functioning ("GAF") score increased from 30 to 60 during her stay. Tr. 277.

On May 10, 2005, Plaintiff saw psychiatrist Cecilia Farina-Morin, M.D. with complaints of fatigue, varying mood, and visual hallucinations. She reported to Dr. Farina-Morin that one of her medications gave her dry mouth, so Dr. Ward had changed it. She found no benefit from the new medication. She also indicated she was having visual hallucinations, seeing people, and sometimes thought her family might be better off without her because her husband had to do everything. Tr. 272.

She again saw Dr. Farina-Morin on May 18, 2005, indicating that her mood had been up and down. Examination showed that Plaintiff had spontaneous speech, an appropriate affect, and a depressed and anxious mood. Tr. 268. She also reported auditory and visual hallucinations and was overly worried about her children's safety, thinking somebody might take them. Tr. 268.

On June 1, 2005, Plaintiff again saw Dr. Farina-Morin and reported feeling better. She was doing more around the house and with the children. She said she still saw "people and things" but was not upset by them. She reported being tired and having

mood swings, as well. She indicated that she sometimes forgot to take her antidepressant medication. She had a depressed mood, an appropriate affect, spontaneous speech, logical thought processes, and appropriate thought content. Dr. Farina-Morin noted that Plaintiff had a "slowly improving" mood. Tr. 266–67.

Plaintiff again saw Dr. Farina-Morin on June 15, 2005 and reported feeling more depressed. Tr. 264. On June 29, 2005, Plaintiff told Dr. Farina-Morin she was feeling better/less depressed, but that she had had a few crying spells when the children mentioned her grandmother, who had died. Tr. 261. She told Dr. Farina-Morin that she had a frightening visual hallucination that may have been related to a great uncle whom she believed was schizophrenic. Tr. 261.

At her next visit on July 21, 2005, Dr. Farina-Morin noted that Plaintiff was not "overly concerned" about her visual hallucinations. Plaintiff told Dr. Farina-Morin that she had applied for disability. Dr. Farina-Morin noted that she agreed that Plaintiff's depression continued to be too severe for her to work. Tr. 259.

On August 10, 2005, Plaintiff saw Dr. Farina-Morin. Plaintiff noted her mood was "about the same" and she was a "little less depressed." Notes indicated Plaintiff had experienced "only 3 hallucinations in 3 weeks." Tr. 257.

In September 2005, Dr. Farina-Morin noted that Plaintiff was more depressed after her disability hearing, but was not seeing her counselor because of problems getting a babysitter. Tr. 285–86.

On October 6, 2005, Dr. Farina-Morin reported that Plaintiff was "feeling better in terms of mood" and said therapy had "really helped." Tr. 283.

On October 10, 2005, Dr. Farina-Morin wrote a letter indicating that Plaintiff's "psychotic symptoms ha[d] slowly responded to Amblify," and that Cymbalta seemed to be "helping [her depression] more." She also noted:

> During the time I have been seeing Mrs. Freeman, I have advised her that she is not able to work. Her depression is still significant and the added stress of any type of employment in addition to caring for her children, in my opinion, would exacerbate her depressive symptoms. . . . Mrs. Freeman's depression was showing some signs of improvement, but she had a significant set-back after her disability hearing. . . . Mrs. Freeman has been struggling with very serious depression and her financial struggles due to her inability to work have added to her stress and to the level of depression. I believe she wants to return to being active and functioning, including working. We are continuing to treat her depression aggressively. However, I still do not feel she is ready to return to work outside the home and anticipate it may be at least three to six months before she would even be ready to consider some work preparation or training.

Tr. 281–82.

Plaintiff attended counseling on October 11 and 20, 2005, at which time she had "good" insight and intact judgment, and her depression and hallucinations were "better." Tr. 299–300. Later that month, she reported financial stress and hearing voices. Tr. 684, 686. Treatment notes from November 2005 showed that Plaintiff had cared for her ill grandmother until she passed away, and that her grandfather now had cancer. Plaintiff reported continued memory problems and visual hallucinations that were "not upsetting" to her. She had logical thought processes and appropriate thought content. Tr. 680, 682.

On December 5, 2005, Plaintiff saw Dr. Ward and said her psychiatric symptoms were "remarkably better" with treatment. Her examination was unremarkable. Tr. 287–88. She also saw her counselor, who noted she was depressed with a flat affect and had hallucinations. Tr. 297–98, 601–02 (duplicate).

In January 2006, Plaintiff's counselor, Joe Watterson, noted Plaintiff was using relaxation and cognitive techniques to handle stressors with "some success." Tr. 598.

Plaintiff saw Dr. Farina-Molin in January and February 2006. In January, she reported feeling more depressed. Tr. 678–79. In February, she reported feeling better and less stressed and indicated hallucinations were not upsetting to her. Tr. 675–76.

In March 2006, Dr. Ward noted that Plaintiff's mental health therapy was "helpful" (Tr. 613–15), and Plaintiff told Dr. Farina-Morin that her mood was better. Tr. 674.

Mr. Watterson noted in March 2006 that Plaintiff had been "pretty stable for some time" and her "symptoms [were] much improved." Tr. 595. He also noted she was being forgetful and that Dr. Farina-Morin wanted her to have a neurological consult. *Id.* In April 2006, Plaintiff saw Watterson, who noted that her depressive symptoms "seemed stable," and that she heard voices "at times but less than before" and was "less bothered by them." Tr. 598. He also noted she should continue therapy to "maintain and improve her level of functioning." *Id.*

In May 2006, Plaintiff saw Dr. Farina-Molin, who indicated Plaintiff's attention problems persisted, but that her mood was "much improved" and her visual hallucinations

had "completely resolved." She also noted that Plaintiff's mood was "overall much better than when [Plaintiff] first started seeing [her]." Tr. 669–70.

In June 2006, the month Plaintiff's insured status expired, Plaintiff was overwhelmed because school was out for the summer and the children were fighting a lot. Dr. Farina-Morin restarted one of Plaintiff's medications, noting that Plaintiff was doing better when she was taking it previously. Tr. 667, 669. Plaintiff continued to participate in mental health treatment in 2006. Tr. 650–51, 661, 664.

In September 2006, Freeman was referred to a neurologist, Dr. Murthy, for an MRI and a sleep study. The sleep study showed mild sleep apnea, but the MRI results revealed nothing new. Dr. Murthy put her on Adderall for her memory and attention span problems. He also suggested physical therapy, but Freeman told him she did not have time to go. Tr. 648. She told Dr. Ward that she was disappointed the studies did not reveal the cause of her memory problems and whether it would get worse. Tr. 661.

In October 2006, consulting examiner Lisa Klohn, Ph.D., reviewed Plaintiff's medical records and provided a Psychiatric Review and a Mental RFC Assessment for the period from January 7, 2006 through June 30, 2006, when Plaintiff's insured status ended. Tr. 691–708. She found that Plaintiff had a severe impairment, but would not have been precluded from performing unskilled work. Tr. 703. Her RFC assessment found that Plaintiff had moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. Tr. 701. She indicated Plaintiff's abilities were not significantly limited in most areas and moderately limited in the

following areas: to carry out and remember detailed instructions; to maintain attention and concentration for long periods; to perform activities within a schedule, maintain attendance, and be punctual; to complete a normal workday and workweek without an unreasonable number of breaks; and to work with the general public. Tr. 705–06.

In August 2008, after Plaintiff had visited with his nurse twice, James Shaw, M.D., opined that Plaintiff could not engage in many work-related mental activities for more than twenty percent of a workday, and that such limitations had been present since December 2001. Tr. 714–17.

C.     The Hearing Before the ALJ

1.     Plaintiff's Testimony

At the administrative hearing on September 4, 2008, Plaintiff testified that she had returned to work part-time in April or May 2007 as a substitute teacher, and was still working in that capacity as of the hearing. Tr. 722–23. She said that she generally worked about two days a week, for seven hours per day. Tr. 723–25, 740–41. She said that she had also worked in the school cafeteria. Tr. 726, 739. She said she would probably have to turn down work two or three days out of ten. Tr. 728, and that she would be willing to work every day if she felt better. Tr. 727. She said she had difficulty handling her job but was able to do it. Tr. 735, 738–40. She said she lived at home with her husband and two children, ages six and seven and was able to drive. Tr. 729–30. She said she stopped seeing her psychiatrist regularly when her Medicaid insurance ended in late 2006, (Tr. 730–32), and had sought mental health treatment and taken medications intermittently

since then. Tr. 731–33, 744–47. She said she functioned a "little better" on medications. Tr. 747. She said she had never seen Dr. Shaw. Tr. 734. She said she had visual hallucinations of a man in her house (usually at night) or animals (usually when driving during the day). Tr. 741–43. She said she generally experienced hallucinations about once a week. Tr. 742. She said that she could not have worked eight hours a day, five days a week at any time during the period at issue. Tr. 748.

2.      VE Testimony

VE Joel E. Leonard, testified that Plaintiff's past job as a mail sorter was light and unskilled in the manner she performed it. Tr. 342–43. The mail job could also have been semi-skilled based on what she was doing. He stated that the remainder of her work activity, which included that of a document preparer, ranged from sedentary to medium and from unskilled to semi-skilled. Tr. 342–44.

The ALJ asked the VE to assume a person of Plaintiff's education and work experience who was limited to medium exertional work because of back problems, and because of her mental problems would be limited to simple routine work, a low-stress environment, meaning one requiring few decisions with no more than occasional interaction with the public, and because of memory problems, the avoidance of hazardous machinery. Tr. 344. The VE testified that such a person could perform Plaintiff's past work "as a document preparer when she was sorting the mail or could do sedentary unskilled work." Tr. 345.

### 3. The ALJ's Decision

The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. § 404.1520 in determining that Plaintiff was not disabled. The ALJ found at step one that, although Plaintiff had worked part-time, she had not worked at the substantial gainful activity level since her alleged onset date in December 2001 (Tr. 360). At step two, the ALJ found that Plaintiff's degenerative disc disease and mental disorders were "severe" impairments. Tr. 360. At step three, the ALJ found that Plaintiff's impairments did not meet or equal any impairments in the Listings at 20 C.F.R. pt. 404, subpt. P, app. 1, so as to be presumptively disabling. Tr. 360–62. The ALJ then assessed Plaintiff's residual functional capacity by evaluating the medical evidence and her subjective complaints. Tr. 362–72. The ALJ also found that Plaintiff's allegations regarding the extent of her limitations were not fully credible. Tr. 369. After considering all the evidence, the ALJ found that Plaintiff had the residual functional capacity to perform unskilled and low stress medium work with no more than occasional public interaction and no exposure to hazardous conditions. Tr. 362. At step four, the ALJ found that Plaintiff's residual functional capacity would not preclude her from returning to her past unskilled light work as a document preparer/mail sorter. Tr. 372. He concluded, therefore, that she was not disabled under the Social Security Act. Tr. 373.

## II.  Discussion

Plaintiff argues that the Commissioner's findings are in error because the ALJ failed to give appropriate weight to the opinions of Plaintiff's treating physicians.

A.     ALJ Findings

In his October 29, 2008 decision, the ALJ made the following findings of fact and

conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2006, but not thereafter.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 6, 2001, through her date last insured of June 30, 2006 (20 CFR 404.1520(b) and 404.1571, et seq.).

3.  Through the date last insured, the claimant had the following severe impairments: degenerative disc disease and schitzoaffective disorder/major depressive disorder with psychotic features (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404. Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work except that she was restricted to performance of simple routine tasks in a low stress environment (defined as requiring few decisions) with no more than occasional interaction with the general public and no exposure to hazardous conditions such as dangerous machinery.

6.  Through the date last insured, the claimant's past relevant work as document preparer/mail sorter did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant was not under a disability as defined in the Social Security Act, at any time from December 6, 2001, the alleged onset date, through June 30, 2006, the date last insured (20 CFR 404.1520(f)).

Tr. 360, 362, 372–73.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines "disability" as follows:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at

any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine

whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

      1.    The ALJ Appropriately Considered and Discounted Opinions of Plaintiff's Treating Physicians.

The ALJ found that Plaintiff was not disabled during the period from her alleged onset-of-disability date, December 6, 2001, through her date last insured, June 30, 2006. More specifically, he found she retained the RFC to perform medium work that was "restricted to performance of simple routine tasks in a low stress environment (defined as requiring few decisions) with no more than occasional interaction with the general public and no exposure to hazardous conditions such as dangerous machinery."  Tr. 362. He found that her RFC would permit her to perform her PRW as a document preparer/mail sorter.  Tr. 372.

Plaintiff's sole appellate allegation is that the ALJ improperly discounted opinions of her treating medical sources, which resulted in a decision unsupported by substantial evidence.  *See* Pl.'s Br. 22–34; Pl.'s Reply 1–6.  Plaintiff challenges the ALJ's consideration of three of her doctors: her treating general physician, Dr. Ward; her psychiatrist, Dr. Farina-Morin; and a "physician from a clinic where [Plaintiff] had been receiving care for the weeks just before the hearing," Dr. Shaw.  Pl.'s Br. 23.

The Commissioner counters that the ALJ's findings are supported by substantial evidence and that he properly considered the opinions of these three doctors.  Def.'s Br. 11–14, 15–16. He further argues that Plaintiff asks the court to improperly "re-weigh" the

record evidence and that the ultimate opinion as to whether Plaintiff can work is within the province of the Commissioner, not the doctors. *Id.* at 12, 15–16.

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). When assessing a treating source's opinion, the ALJ shall consider the factors in 20 C.F.R. §§ 404.1527(d)(2) through (d)(6). However, determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance").

The Fourth Circuit has set forth the following considerations for an ALJ when weighing and evaluating medical opinions: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559,

563 (4th Cir. 2006); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. §

404.1527(d). The rationale for the general rule affording opinions of treating physicians

greater weight is "because the treating physician has necessarily examined the applicant

and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting*

*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). An ALJ, though, can give a treating

physician's opinion less weight "in the face of persuasive contrary evidence." *Mastro*,

270 F.3d at 178. Further, in undertaking review of the ALJ's treatment of Plaintiff's

treating physicians, the court remains mindful that its review is focused on whether the

ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to

re-weigh conflicting evidence, make credibility determinations, or substitute [its]

judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

   a. The ALJ Properly Considered and Discounted the Opinion of
     Dr. Ward and Dr. Farina-Morin.

 In October 2004, Dr. Ward opined that Plaintiff was "totally and permanently

disabled and unable to perform any substantial gainful employment." Tr. 196. Dr. Ward

indicated that, although she hoped for a "reduction in [Plaintiff's] Psychotic symptoms

with trials of different medications and counseling, I do not feel that she is likely to

improve to the point where she will be able to hold a job." Tr. 196. Plaintiff began

seeing Dr. Farina-Morin in April 2005. In October 2005, Dr. Farina-Morin wrote that she

had advised Plaintiff that she was unable to work, explaining that the added stress of any

employment would "exacerbate" her mental symptoms. Tr. 281. Dr. Farina-Morin

further stated that it would be "at least three to six months before [Plaintiff] would even be ready to consider some work preparation or training." Tr. 281–82.

In his decision, the ALJ explained the opinions of Dr. Ward and Dr. Farina-Morin (Tr. 370), and provided these explanations for affording them little weight:

> In their progress notes and in their narrative reports. both doctors noted good response to medications with improvement in symptoms. Additionally, despite Dr. Ward's statement regarding stress worsening the frightening hallucinations, she repeatedly pointed out that medications helped alleviate the alleged hallucinations and that the claimant reported that the hallucinations did not really bother her. Specifically, in early 2004, Dr. Ward reported that the claimant's psychiatric condition was stable on medications (Exhibits 8F and 10F) and in December 2005 she indicated that with counseling and medications, the claimant's psychiatric symptoms were "remarkably better" (Exhibit B-8F, page 8). Further, records in March 2006 from the claimant's counselor, Joe Waterson, at the Santee Wateree Mental Health Center specifically note that the claimant was responding to medications and had been "pretty stable for some time" (Exhibit B-6F).

> Progress notes from Dr. Ward and Dr. Farina-Morin showed good response to medications and review of the entire record reveals that the claimant was the primary caretaker for her two minor children and, also for a period of time, assisted in the care of her ill grandmother. Additionally, she was able to participate in housework activities and take or pick up her children from school. Their progress notes indicate that the claimant had financial concerns and worries but the weight of the evidence, including records from the mental health clinic, showed that she was able to function fairly well in daily life with good memory and concentration and good comprehension and expression (Exhibit 15F, page 7). The progress notes from Drs. Ward and Farina-Morin do not support their statements of disability and inability to work and the overall evidence which shows intact memory, cognitive function, not being bothered by the intermittent hallucinations, and good response to treatment persuasively contradicts their statements of inability to work. Accordingly, I give little weight to the statements of disability submitted by Drs. Ward and Farina-Morin.

Tr. 371.

Plaintiff argues that the ALJ erred by finding Dr. Ward's and Dr. Farina-Morin's opinions inconsistent with their treatment notes. For example, Plaintiff indicates it was wrong for the ALJ to attach significance to Dr. Ward's findings of "remarkable improvement" and indicating that Plaintiff's condition was stabilized by medication. Pl.'s Br. 23–24 (*citing* Tr. 371). Plaintiff's argument essentially is that clinical notes that one suffering from depression is "stable" or "improved" does not translate into their being able to work. Pl.'s Br. 24.

The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d at 590. Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d at 178 (*citing Hunter v. Sullivan*, 993 F.2 31, 35 (4th Cir. 1992).

In this case, the ALJ thoroughly examined the record and found "persuasive contrary evidence" in the form of the treating notes of Dr. Ward and Dr. Farina-Morin, evidence from her counselor's notes, and the opinions of the state agency physicians who reviewed the entire medical record. Tr. 371. Contrary to Plaintiff's argument, the ALJ

did not merely hand-pick phrases in notes that sounded like they supported his discounting of the opinions. Rather, he reviewed the record as a whole and compared their letters indicating Plaintiff could not work with the whole record—including all of their treatment notes, treatment notes and reports of other treating medical sources, and detailed opinions and RFC assessments of medical consultants. The undersigned finds no error in the ALJ's treatment of these doctors' findings. The ALJ did what statutory and regulatory law require that he do—examine the findings and, if inconsistent with other substantial evidence, explain why he discounted those findings.

The medical evidence, gleaned largely from Dr. Ward's and Dr. Farina-Morin's records, indicate Plaintiff's condition improved with conservative treatment. *See, e.g.*, Tr. 144, 150, 152, 214, 261, 266, 281, 283, 287, 299, 595, 613, 667, 669–70, 747). *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (if a symptom can be reasonably controlled by medication or treatment, it is not disabling). Although Plaintiff was briefly hospitalized for a reaction to one of her psychiatric medications in 2005, she recovered quickly. Tr. 214–53, 277–80, 588–91. *See generally, Payne v. Sullivan*, 946 F.2d 1081, 1084 (4th Cir. 1991) (noting with approval the ALJ's finding that the record as a whole failed "to demonstrate an inability to engage in work activity for a continuous period of at least 12 months"). Mental status examinations both before and after Plaintiff's hospitalization showed that she was alert and fully oriented, and that she had intact speech, intact memory function, a normal neurological status, likely average intellectual functioning, logical thought processes, appropriate thought content, and a normal fund of

knowledge, notwithstanding the ebb and flow of her symptoms of depression and anxiety. *See, e.g.*, Tr. 138–39, 146, 263, 266, 268, 299–300, 650–51, 661, 664, 682. *See Craig*, 76 F.3d at 590 (lack of objective findings supported ALJ's decision to discount opinion). Further, as the ALJ noted, Plaintiff repeatedly indicated that any residual visual hallucinations she experienced were not bothersome, and occurred only intermittently. Tr. 372, *see, e.g.*, Tr. 144, 149, 259, 261, 598, 661, 742. Although Plaintiff argues that it was improper to even consider Plaintiff's comments about the hallucinations not being troublesome, her doctors noted such things regularly. In response to an inquiry from Social Security, Dr. Ward at one time told them she had not referred Plaintiff for further treatment because her hallucinations, although present, were not troubling. Tr. 144. Plaintiff's argument on this point fails.

The medical evidence supports the ALJ's determination that the doctors' findings that Plaintiff was unable to function sufficiently to sustain employment were contrary to the substantial record evidence. Plaintiff's impairments did not impair her functioning to a disabling degree. *See Gross*, 785 F.2d at 1166 (explaining that a plaintiff must show functional loss, not just an impairment).

Further, the ALJ specifically noted the opinions were contrary to clinical notes from other mental health professionals who treated Plaintiff. Tr. 371 (finding opinions contrary to records from Plaintiff's counselor). The ALJ also discussed the opinions of state agency psychological consultants who had reviewed the full record and concluded that Plaintiff retained the ability to perform unskilled and low-stress work with limited

public contact. *See* Tr. 172–88, 691–708. *See Smith*, 795 F.2d at 345-46 (opinion of non-examining physician can constitute substantial evidence to support the decision of the Commissioner); SSR 96-6p (findings of state agency psychological consultants are expert opinions the ALJ must consider).

The ALJ also explained that it had considered Plaintiff's daily activities as she testified at the hearing and as relayed in the record, including the treatment notes of Dr. Ward and Dr. Farina-Morin. The ALJ found the opinions to be contradicted by Plaintiff's participation in these activities and the evidence that she was "able to function fairly well in daily life." Tr. 371. *See, e.g., Johnson*, 434 F.3d at 658 (daily activities supported ALJ's determination that Plaintiff was not disabled). Among other things, the record showed that Plaintiff was able to care for her personal needs, drive a car, perform housework, care for her ill grandmother, and be the primary caretaker for her two children. Tr. 361-62, 367-68, *see, e.g.*, Tr. 137-38, 212, 266, 729-30. The ALJ properly considered this information in his analysis. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding it appropriate to consider subjective complaints by examining how they impact a claimant's "routine of life").

The ALJ reviewed the record evidence and found the opinions of Dr. Ward and Dr. Farina-Morin inconsistent with the record as a whole. He appropriately performed this review, considered Plaintiff's testimony and credibility, and determined the treating physicians' opinions that she could not work inconsistent with the record. The court finds he did not err.

In addition, as pointed out by the Commissioner and by the ALJ in his decision, conclusory statements from medical sources that a patient is "disabled" or "unable to work" are not for the medical sources to decide. "An ALJ is not bound by a conclusory opinion of disability or entitlement to benefits, even when rendered by a treating physician, since the issue of disability is the ultimate issue in a Social Security case and that issue is reserved for the Commissioner." *Carroll v. Astrue*, 3:09-1761-JFA, 2010 WL 2423000 (D.S.C. May 3, 2010) (citing 20 C.F.R. § 404.1527(e)(1)). *See also* SSR 96-5p and law cited above.

In October 2005, Dr. Farina-Morin opined that Plaintiff was "not able to work," and "not able to return to work" or "even be ready to consider some work preparation or training" any earlier than "three-to-six months [from the date of the letter.]" Tr. 281–82. The Commissioner is to make that decision. The ALJ did not err in discounting her opinion.

Dr. Ward's opinion is even more conclusory and absolute. In October 2004, she wrote that Plaintiff was "totally and permanently disabled and unable to perform any gainful employment due to Schizophrenia." Tr. 196. This is a paradigm of what the Commissioner, not the doctors is to decide. The ALJ's finding should be upheld.

        b.      The ALJ Properly Considered and Discounted the Opinion of Dr. Shaw.

Although she only mentions it in passing in her two briefs, Plaintiff asserts that the ALJ erred in discounting the opinion of Dr. Shaw. In August 2008—over two years after

Plaintiff's insured status had expired—Dr. Shaw provided the opinion that, as of December 2001, Plaintiff's mental impairments had rendered her unable to complete a full workday. Tr. 716–17.

The ALJ considered the submission of Dr. Shaw and explained the following:

> I also considered the August 20, 2008, signed statement from Dr. James Shaw pertaining to the claimant's ability to meet occupational and performance adjustments, manage benefits, and perform other work-related activities (Exhibit B-23F). Although in his pre-hearing brief. the claimant's attorney referred to Dr. Shaw as the claimant's psychiatrist (Exhibit B-17F, page 2), Dr. Shaw is actually a family practitioner. Regardless, the claimant testified that she had never actually been examined or seen by Dr. Shaw. The claimant was seen on two occasions by Dr. Shaw's nurse, Melinda Kelly. However, the progress notes do not document observations which would support Dr. Shaw's conclusions (Exhibit B-22F). It is not clear upon what Dr. Shaw based his conclusions as the progress notes from his own office do not support his conclusions. Further, Dr. Shaw's statement is more than two years after the period in question and although he purported to relate the limitations back to December 2001, he failed to provide supporting data. At the time of Dr. Shaw's statement the claimant was undergoing no psychological or mental health treatment. As noted above, the evidence shows that the claimant has responded quite well to treatment For all of these reasons, I give very little weight to the August 2008 statement from family practitioner, Dr. James Shaw.

Tr. 372.

The ALJ properly discounted Dr. Shaw's opinion. The undersigned is not convinced that Dr. Shaw would even qualify to be considered a "treating physician" of Plaintiff. As the ALJ pointed out, Dr. Shaw never even examined Plaintiff, and his nurse only saw her twice, several years after Plaintiff's insured status had ended. Tr. 372, 374. *Cf.* 20 C.F.R. § 404.1527(d)(2)(I) (listing "frequency of examination" as factor considered in weighing a medical opinion). Even if the physician is considered

"treating," the ALJ may properly reject such a physician's retrospective opinion when it is not supported by objective testing or the record as a whole. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). The ALJ properly accorded Dr. Shaw's opinion "very little weight." Tr. 372.

      2.    Substantial Evidence Supports the ALJ's Decision that Plaintiff Could Return to Her Past Relevant Work.

In conclusion, the court finds the ALJ appropriately considered the record as a whole and explained the weight he afforded opinions, and why. Beyond that, the court's role is not to reweigh the evidence, although it seems that is what Plaintiff would have the court do. Although the evidence may be susceptible to more than one interpretation, the ALJ, as finder of fact, bears the ultimate responsibility of weighing the evidence and resolving evidentiary conflicts. *See Craig*, 76 F.3d at 589 (noting the ALJ bears the responsibility of making findings of fact and resolving evidentiary conflicts). When, as here, the ALJ's determination is supported by substantial evidence and free of reversible legal error, the court cannot re-weigh the evidence or substitute its own judgment for that of the Commissioner. *See Hays*, 907 F.2d at 456; *see also Millner v. Schweiker*, 725 F.2d 243, 245 (4th Cir. 1984) (noting that, in reviewing decision under the substantial-evidence standard, "it is immaterial that eight medical witnesses disagreed with the A.L.J'.s conclusion, provided that one such witness gave sufficient probative evidence.").

The ALJ's decision should be affirmed. *See Blalock*, 483 F.2d at 775; *see also Thomas*, 331 F.2d at 543 (noting job of court is to scrutinize the record as a whole to

determine whether the conclusions reached are rational). He appropriately considered all record evidence and explained his reasons for discounting some evidence and opinions. His finding that Plaintiff retained the RFC to perform a range of unskilled and low-stress work with no more than occasional public contact is supported by record evidence, as is his finding Plaintiff retained the ability to perform her PRW.

At Plaintiff's initial administrative hearing in August 2005, she testified about the duties of her past work as a mail sorter. Tr. 312. Additionally, the VE testified that someone with limited to unskilled and low-stress work with no more than occasional contact with the public could perform Plaintiff's past job as a mail sorter. *See* U.S. Dept. of Labor, Dictionary of Occupational Titles (DOT) § 209.687-026 (4th ed., Rev. 1991); 20 C.F.R. § 404.1560(b)(2) (allowing ALJ to rely on vocational expert testimony at step four). The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands, and nonexertional demands of such work." SSR 82-62; *see also* 20 C.F.R. § 404.1560(b)(2) ("We will ask you for information about work you have done in the past."). In this case, the ALJ properly relied on reports supplied by Plaintiff regarding her PRW to conclude that the demands of her past job as a mail sorter were "consistent with her residual functional capacity." Tr. 373, *see* Tr, 69, 493, *see also* Tr. 497 (vocational analysis by state agency)). It was Plaintiff's burden to establish she was incapable of performing her PRW, and she failed to do so in this case. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's mental conditions, and that this decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, 42 U.S.C. Section 405(g), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

August 12, 2010                                   Shiva V. Hodges
Florence, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**